**UNITED STATES v. COTTON VALLEY OPERATORS COMMITTEE et al.**
**Civ. A. No. 2209.**

District Court, W. D. Louisiana,
Shreveport Division.

Jan. 21, 1948.

**2**

Tom C. Clark, Atty. Gen., John F. Sonnett, Geo. B. Haddock, W. B. Watson Snyder and Jas. R. Browning, Sp. Asst. Attys. Gen., and Malcolm S. Lafargue, U. S. Atty., of Shreveport, La., for plaintiff.

John M. Madison, W. S. Wilkinson, Wilkinson, Lewis & Wilkinson, Jno. T. Gayton, J. R. Goff and Sidney G. Meyers, all of Shreveport, La., and Vernon Roberts, of Ada, Okl., for defendants.

DAWKINS, District Judge.

The Government brought this suit under the provisions of Section 4 of the Act of July 2, 1890, c. 647, 26 Stat. 209, 15 U.S. C.A. § 4, commonly known as the Sherman Anti-Trust Law, charging some fifteen corporations and eighteen individuals, with conspiring to "restrain unreasonably and to monopolize trade and commerce in the liquid and gaseous carbohydrates" taken from the Cotton Valley Field of Webster Parish, as follows:

"Said combination and conspiracy has consisted of a continuing agreement and concert of action among the defendants the substantial terms of which have been and are the defendants:

"(a) Agree to jointly engage in and exclude others from the business of extracting, processing and refining various separate hydrocarbons and hydrocarbon products from over 85% of the natural flow of liquid and gaseous hydrocarbons produced from said Field and not reinjected therein, which said business of extracting, processing and refining was in addition to that required to separate said hydrocarbons from said natural flow or to reinject the residue thereof into the Field;

"(b) Agree to jointly engage in and exclude others from the business of distributing and selling all of the hydrocarbons and hydrocarbon products jointly extracted, processed or refined by the defendants from over 85% of the natural flow of liquid and gaseous hydrocarbons produced from the Field and not reinjected therein.

"(c) Agree to jointly sell through channels of distribution jointly selected by the defendants all of the hydrocarbons and hydrocarbon products extracted, processed or refined by the defendants from over 85% of the natural flow of liquid and gaseous hydrocarbons produced from the Field and not reinjected therein.

"(d) Agree upon fixed and uniform prices and terms and conditions of sale for each of the hydrocarbons and hydrocarbon products extracted, processed or refined by the defendants from over 85% of the natural flow of liquid and gaseous hydrocarbons produced from the Field and not reinjected therein, and agree to sell each of said hydrocarbons and hydrocarbon products at the said fixed and uniform prices and upon said terms and conditions of sale."

The bill itself, under the heading "Background" enumerates the conditions prevailing in the field, which brought about the original joint action of the defendants as follows:

"The Cotton Valley Oil Field is located in Webster Parish in the State of Louisiana. Whenever the term 'Field' is hereinafter used, it is intended to mean the said Cotton Valley Oil Field including the natural underground reservoirs in said Field in which hydrocarbons are present.

"The Field contains hydrocarbons in both liquid and gaseous forms. These hydrocarbons are under high pressure within the reservoirs, and in the exploitation of the Field this pressure is utilized to bring both the liquid and gaseous hydrocarbons to the surface of the ground. This flow of liquid and gaseous hydrocarbons as it reached the surface is sometimes hereinafter referred to as the 'natural flow' from the Field. The greater part of the hydrocarbons in the Field are found at

depths in excess of 8,000 feet. The ratio of gaseous to liquid hydrocarbons in the Field is in excess of 10,000 cubic feet of gas to one barrel of liquid. The cost of producing liquid hydrocarbons from individual wells is high. Rights to produce hydrocarbons from the Field are owned by more than thirty individuals and corporations. The production of gaseous and liquid hydrocarbons from the Field without reinjecting a part thereof into the Field would result in the rapid reduction of the underground gas pressure necessary to the ultimate recovery of both liquid and gaseous hydrocarbons from the Field. It is economically impracticable for individual owners to reinject a part of the gaseous and liquid hydrocarbons into the Field.

"In an effort to find a solution to these problems the producers in the Field erected an experimental injection station in 1939. From this experiment it was determined that certain of the liquid and gaseous hydrocarbons could be separated from the natural flow from the reservoirs and the residue could be returned to the reservoirs under pressure, permitting the exploitation of the Field without serious reduction of the pressure within the natural reservoirs. To accomplish this objective the producers of over half of all gaseous and liquid hydrocarbons from the Field entered into an agreement in the spring of 1940 which is known as the Cotton Valley Unitization and Pressure Maintenance Agreement, hereinafter referred to as 'the Agreement'. Thereafter other producers of hydrocarbons from the Field joined and became parties to the Agreement, and at the time of the filing of this complaint the parties thereto produced in excess of 90% of all hydrocarbons taken from the Field. All of the defendants herein are parties to the Agreement or participated in activities related thereto. The purpose of the Agreement as set out in the preamble thereof is that 'of more properly conserving the resources of said common oil, gas and other hydrocarbon field, pool or reservoir, and for the prevention of underground and surface waste.' The Agreement provides for the unitization of liquid and gaseous hydrocarbons within a substantial part of the underground reservoirs of the Field and the pooling of lands containing these substances, for the production of these substances by a joint agency to be known as the Operators' Committee, and the apportionment of the substance so produced to the owners of individual rights in the area covered by the Agreement on an agreed upon basis. The Operators' Committee is authorized by the Agreement to exercise the sole right to drill in the area covered by the Agreement with certain limited exceptions, to enter into contracts for the extension of that area and to plan, coordinate and execute the development and operations within that area for unitized substances. As a part of this development the Operators' Committee is specifically authorized to construct and maintain a modern recycling, pressure maintenance and liquid hydrocarbon extraction and processing plant. The Agreement stipulates that all unitized substances produced from the area covered by the Agreement, except such as may be used for production or development purposes or for repressuring or recycling, shall be apportioned among the owners and allocated on an acreage basis to the several tracts of land comprising such area except that the Operators' Committee shall be empowered to dispose of the gas produced for all owners.

"Pursuant to power delegated by Act Number 225 of the Legislature of the State of Louisiana of 1936, and by Act Number 157 of the Legislature of the State of Louisiana, of 1940, the Commissioner of Conservation of the State of Louisiana issued Order Number 10-B, dated July 1, 1940, and Order Number 10-C, dated January 28, 1941, approving the Agreement only in so far as it provided for the unit operation and development of the area covered by the Agreement and the reinjection into the reservoir under pressure of a part of the liquid and gaseous hydrocarbons produced from said Field."

The results of the alleged acts in restraint of trade and commerce are listed under the heading "Effects".

"The aforesaid combination and conspiracy and the acts and things done by defendants in forming and effectuating said combination and conspiracy, were

intended by the defendants to and have had the following effects:

"(a) Excluded other persons and companies from the business of extracting, processing and refining various separate hydrocarbons and hydrocarbon products, from over 85% of the natural flow of liquid and gaseous hydrocarbons produced from the Field and not reinjected therein;

"(b) Excluded persons and companies other than the defendants and those jointly selected by the defendants from an opportunity to engage in the business of selling and distributing liquid and gaseous hydrocarbons jointly produced by the defendants from said Field and the hydrocarbon products jointly processed, extracted or refined by the defendants therefrom;

"(c) Excluded persons and companies other than the defendants and those jointly selected by the defendants from an opportunity to engage in the business of transporting liquid and gaseous hydrocarbons jointly produced by the defendants from said Field and the hydrocarbon products jointly processed, extracted or refined by the defendants therefrom; and

"(d) Eliminated competition among the defendants, and between the defendants and others, in the extraction, processing and refining, in the transportation, in the distribution, and in the sale of hydrocarbon products extracted from over 85% of the natural flow of liquid and gaseous hydrocarbons produced from the Field and not reinjected therein."

The bill was filed on June 17, 1947. Numerous motions were presented by various defendants, and on October 22, 1947, the Government filed a motion to "strike or limit" defendant, Magnolia Petroleum Company's application to take oral depositions. Up to that time there was no record in this court of said Company's effort to take such depositions for the process had been gotten out in the Eastern and Southern Districts of Texas. Attached to the motion to strike were copies of notices, addressed to the Attorney General and some four of his assistants, to the United States Attorney of this district, and to the numerous attorneys representing the corporations and individuals, that the depositions would be taken as follows: On October 27, 1947, Tom Clark, Attorney General, Malcolm E. Lafargue, United States Attorney for this district, Myron Blalock and Jack Blalock of Marshall, Texas, and L. G. Dufilho of Shreveport, in the State Court House at Marshall, Texas; on October 28th, depositions of Sylvester Dayson (or Dyson), president of Premier Oil Refining Co. of Longview, Texas, and J. Zeppa of Tyler in the state courthouse of Tyler, Texas; and on October 29th, J. R. Parten, president Woodley Petroleum Co., Marlin Sandlin, Myron Blalock and Jack Blalock of Houston, Texas, in the state courthouse in that city.

There was also attached to said motions to strike, of the plaintiff, subpoenas ducem tecum, or to produce, addressed to the Attorney General and to the said U. S. Attorney of this district, as follows: to Tom Clark, Attorney General, demanding that he produce at Marshall, Texas, at the time of giving his deposition on October 27, 1947, documents and records as set forth in the footnote below;[1] to Malcolm E. Lafargue, United States Attorney, documents and records as shown in footnote.[2]

---

[1] "All letters, telegrams, and other communications of every kind or copies thereof (together with copies of replies thereto) received by the Department of Justice of the United States (during the period extending from August 1, 1945, to the date of institution of this action) from private individuals, corporations or associations (including parties to this action) relating to methods of operations conducted by defendant, Magnolia Petroleum Company, or any other defendant herein, alone or in association with other defendants (or any number thereof) in or in connection with the production, processing and manufacturing of liquid and gaseous hydrocarbons produced from the Cotton Valley Field of Webster Parish."

[2] "All letters, telegrams, and other communications of every kind thereof (together with copies of replies thereto) received by the Department of Justice of the United States (during the period extending from August 1, 1945, to the date of institution of this action) from private individuals, corporations or associations (including parties to this action) relating to methods of operations conducted by defendant, Magnolia Petroleum Company, or any other defendant herein, alone or in association with other defendants (or any number thereof) in or in connection

The grounds of the motion to strike or limit were as follows:

"1. Said Notice was filed by defendant Magnolia Petroleum Company before answer without first obtaining leave of this Court.

"2. Said Notice seeks to require the attendance of nonresidents of the district in which the depositions are to be taken in a county other than that in which served and at a place more than 40 miles from the place of service without an order of the Court.

"3. The depositions to be taken pursuant to said Notice could not serve either the purpose of discovery or as evidence in the above entitled action.

"4. The examination contemplated by said Notice would relate to matters which are privileged and which are not relevant to the subject matter involved in the above entitled action.

"5. The examination contemplated by said Notice would relate to information obtained by the attorneys and agents of the Plaintiff in anticipation of litigation and in preparation for trial, and the mental impressions, conclusions, opinions and legal theories of said attorneys, and no showing has been made that denial of disclosure concerning such matters will unfairly prejudice the defendant Magnolia Petroleum Company or cause said defendant undue hardship or injustice.

"6. The taking of depositions contemplated by said Notice would cause unreasonable annoyance, embarrassment and oppression to the Plaintiff and to the witnesses.

"7. Said notice seeks to require the attendance of Tom C. Clark, Attorney General of the United States, at a place remote from his duties at the seat of Federal Government in Washington, D. C., to submit to examination in a preliminary hearing relating to matters of State and of a confidential nature and not relevant to the subject matter involved in the above entitled case, without any showing as to the possible materiality of the testimony of said Tom C. Clark. That said Notice is therefore unduly oppressive and harassing, is contrary to the public interest, and is against public order.

"8. Said notice seeks to require the attendance of Malcolm E. Lafargue, United States Attorney, Western District of Louisiana, at a place remote from his office and duties at Shreveport, Louisiana, to submit to examination in a preliminary hearing relating to matters concerning which he has no personal knowledge, without any showing as to the possible materiality of his testimony. That said Notice is therefore unduly oppressive and harassing, is contrary to the public interest, and is against public policy.

"9. That the examination contemplated by said Notice would relate to matters the disclosure of which is prohibited by Department of Justice Order Number 3229, issued pursuant to the authority of Revised Statute, § 161, 5 U.S.C. § 22 [5 U.S.C.A. § 22]."

(1) The motion to strike might be disposed of by a simple reference to Rule 26(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which allows the taking of depositions before issue joined, before the filing of an answer "by leave of court" in which the suit is pending. No application was made to or granted by this court for the taking of said depositions. See Application of Wisconsin Alumni Research Foundation, D.C.N.J. 1945, 4 F.R.D. 263, 264; Dreskin v. Zinkin, D.C., 6 F.R.D. 615. (Amendment to this rule has been made authorizing taking of depositions without permission of the court before issue joined but the Attorney General has given an opinion that it will not become effective until March —— 1948.) However, since the taking of the depositions was stayed by this court and the dates therefor have long since passed, it is thought proper for the guidance of the parties in the future, that the Court should rule upon the issues raised by the motion to strike.

(2) As to the notice to the Attorney General and his assistants, the court may take cognizance of the fact that his official duties are performed in Washington,

---

with the production, processing and manufacturing of liquid and gaseous hydrocarbons produced from the Cotton Valley Field of Webster Parish."

D. C. many times the distance of 40 miles, within which a witness may be required to appear, and these witnesses cannot be made to respond. Rule 45(d)(2).

■ As to the United States Attorney, Shreveport is some 37 miles from Marshall, Texas. The rule just cited provides that "a resident of the district in which a deposition is to be taken may be required to attend, etc. A nonresident of the district (in which the deposition is to be taken) may be required to attend * * * within 40 miles from the place of service, or at such other place as is fixed by the court." In this instance there was no place fixed by the court, for the reason no order for the taking of the deposition of the District Attorney was obtained, but if the right to take it had existed at the time, without this order, then he was within the range which permitted him to be summoned to Marshall, Texas, since he was "a nonresident of the district" in which the deposition was to be taken.

(3) The third point of the motion to strike, that the "depositions could not serve the purpose of discovery or as evidence" involves much of what is raised in Nos. 4 and 5.

In response to the motion to strike, Magnolia Petroleum Co., at whose instance the notice to take the depositions was issued, has answered, stating in substance what it expected to prove thereby (a) that the suit of the Government was not filed in good faith, (b) that the United States is only a nominal party and the real plaintiff, not named in the case, is the Premier Oil Refining Company of Texas, "its president, officers, directors and stockholders", (c) that it was filed to pay a political debt of the present national administration, (d) its purpose is to further the final interest of the said corporation, its officers and stockholders, (e) for which reasons the Plaintiff and the Attorney General come into court with "unclean hands", (f) that the purpose is to permit or foster a monopoly on behalf of said corporation in the Cotton Valley field, (g) that plaintiffs are using Woodley Petroleum Co., a subsidiary of the Premier Oil Refining Co., whose officers and stockholders are largely common to those of the former, as a nominal defendant to have it enter "a sort of plea of guilty and thereby 'run interference' for the plaintiff and the said Premier Oil Refining Co., to help it achieve a monopoly over distillate from the Cotton Valley Oil field or to insure a future treble damage suit for" it and plaintiff. The three succeeding paragraphs (h), (i) and (j) are largely elaborations of the preceding ones; (k) denies that the communications between the Attorney General and the persons named are confidential, (1) that the information sought would enable the Court to understand the "background" of the suit to enable it to balance equities, (m) unless it, Magnolia Petroleum Company is permitted access to the information thus sought, it would be "deprived of its day in court" and be denied due process of law. Paragraphs (n) and (o) are also elaborations of matters covered by preceding numbers.

Rule 26 provides (a) for the taking of oral depositions "for the purpose of discovery or for use as evidence in the action or for both purposes * * * in accordance with these rules. * * * (b) * * * regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *."

■ Defendant, Magnolia Petroleum Company (called Magnolia) charges that the suit was not filed in good faith, not because it does not state a cause of action under the Sherman Anti-Trust Act, but because, as this defendant alleges, action was induced by political considerations and to pay a political debt to the Premier Refining Co. (called Premier), not made a party. It would seem sufficient to say that, if the complaint alleges facts, which, under the law, would entitle the plaintiff to relief, and this were substantially proven, the Court could not decline to award judgment even though it might have been inspired in the manner charged. Suppose, on final hearing it should be shown that defendants had violated the anti-trust statute to the extent and in the manner charged and Magnolia was able to show that the Attorney General, his assistants and the United States Attorney had acted at the instance of Premier for the reasons which

Magnolia alleges, then this could not thwart a lawful result.

It is the conclusion that the matters charged in paragraphs (a) to (f) inclusive, show that the testimony sought from the Attorney General and the United States Attorney is irrelevant.

As to the charge (h) that Woodley Petroleum Company (called Woodley) was made party defendant for the purposes stated, when in reality its interest was the same as Premier, if it should be found at the trial that the former is not a bona fide defendant, the bill as to it should be dismissed, and otherwise what has been said as to the preceding paragraphs applies in this instance.

With respect to the charge (i) that for the reasons alleged in the preceding paragraphs the plaintiff (United States) comes into court with "unclean hands", it is believed that this principle should be confined to matters wherein the party so charged was guilty of some act or acts which were similar to those complained of or attributed to the defendants, or that complainant had committed others of a nature such that good conscience with respect to the subject matter would not permit the complainant to be heard. The answer in no sense charges that these Government officers have participated in acts involving the merits of the matter, which would deprive the Government of its right to insist that the defendants be held to account for their alleged wrongdoing. A simple illustration, it is thought will serve to show the irrelevancy of these charges. Should the National Administration change between now and the trial of this case on the merits, and the new Attorney General should determine to go forward with it, no one could seriously contend that the alleged conduct of the present officers could serve to prevent that course. Then, too, fundamentally officers of the United States cannot bind it either adversely or favorably by action intended to serve their personal ends. Its right to proceed and to have relief according to the facts proven under the complaint cannot be diminished by this conduct of its agents. These observations apply equally to paragraphs (j) to (o) inclusive.

From what has been said it follows that the subpoenas ducem tecum should be recalled and quashed.

### Motions for More Definite Statement of Facts.

Motions for more definite statement of facts have been filed by a number of defendants. Counsel for one or more of these have asked and will be granted further hearing thereon, and until this has been done, said motions will not be disposed of.

This course will also be pursued as to the exceptions that the complaint fails to state facts upon which relief can be granted. After the motions for more definite statements are out of the way, it will be time to determine whether the bill alleges a cause of action.

Proper decree should be presented.